```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


   JASON LEOPOLD,                     :
                                      :
                   Plaintiff,         :   Civil Action
                                      :   No. 14-1988
   v.                                 :
                                      :
   UNITED STATES OF AMERICA,          :   February 6, 2015
                                      :   2:20 p.m.
                                      :
                                      :
                   Defendant.         :   Washington, D.C.
                                      :
   .............................. :
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE RICHARD J. LEON,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | **Jeffrey Louis Light, Esq.** |
| | LAW OFFICES OF JEFFREY LIGHT |
| | 1712 Eye Street, NW |
| | Suite 915 |
| | Washington, DC 20006 |
| | (202) 277-6213 |
| | Fax: (202) 223-5316 |
| | Email: |
| | Jeffrey@lawofficeofjeffreylight.com |
| | |
| For the Defendant: | **Carol Federighi, Trial Attorney** |
| | U.S. DEPARTMENT OF JUSTICE |
| | Civil Division, Federal Programs |
| | Branch |
| | P.O. Box 883 |
| | Washington, DC 20044 |
| | (202) 514-1903 |
| | Email: Carol.federighi@usdoj.gov |
| | |
| | **Elizabeth Shapiro, Trial Attorney** |
| | U.S. DEPARTMENT OF JUSTICE |
| | Civil Division, Federal Programs |
| | Branch |
| | Washington, DC 20044 |

Court Reporter:                    **Scott L. Wallace, RDR, CRR**
                                   Official Court Reporter
                                   Room 6503, U.S. Courthouse
                                   Washington, D.C. 20001
                                   202.354.3196
                                   scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**AFTERNOON SESSION, FEBRUARY 6, 2015**

(2:20 p.m.)

THE COURTROOM CLERK:  Your Honor, we have Civil Action 14-1988, Jason Leopold versus the Department of Justice.  I'll ask that counsel please approach the lectern and identify yourselves for the record.

MR. LIGHT:  Good afternoon, Your Honor.  Jeffrey Light on behalf of Plaintiff Jason Leopold.

THE COURT:  Welcome.

MS. FEDERIGHI:  Good afternoon.  Carol Federighi on behalf of the defendant, and I have Elizabeth Shapiro with me here as well from the Department of Justice.

THE COURT:  Well, Mr. Light, did you wear your pragmatist hat?  Because there's no way you're going to get a PI ruling before this candidate's confirmed.

MR. LIGHT:  Well, I'm not sure I agree with that assessment, Your Honor.  Right now --

THE COURT:  Listen carefully to what I said.

MR. LIGHT:  Okay.

THE COURT:  There is no way you will get a ruling.  Only one person in the world can give you a ruling, and you're talking to him, before this candidate is confirmed.  I'm in the fifth week of a ten plus week trial.  There is no chance, none, that you'll get a ruling from this court in the next five to six weeks.  There is no practical possibility in my mind, unless you

know something I don't know, that the Attorney General will not be voted on in the next five to six weeks.  Do you have some insight to share with the Court?

MR. LIGHT:  Well, Your Honor, there was a news report yesterday that Senator Crews may be putting a hold and attempting to delay for some time the vote on the Attorney General.

As it is now, the committee vote is not likely to occur until after the February recess, which would not put a final vote by the full senate until March.  So it may very well be that it's some time after five weeks from now before there's a final vote.

THE COURT:  You won't get a ruling from this Court in March.

MR. LIGHT:  Well, Your Honor, at this point we don't know how long it's going to be before the vote takes place.

THE COURT:  There's no reason why you can't consolidate this PI into the merits and have a merits hearing later on after my trial is over.  Be practical, Mr. Light.  Put your practical hat on.  Do you want me to write two opinions, a PI opinion and a merits opinion?  Do you want the Court to do that in the middle of a ten-week trial, eleven-week trial?

MR. LIGHT:  Your Honor, it may be that without writing an opinion the Court could issue an order.

THE COURT:  Not possible.  You're not familiar with the D.C. Circuit.  Grants and denials of PIs have to be in written form.

MR. LIGHT:  That's correct.

THE COURT:  Right.

MR. LIGHT:  But it doesn't necessarily need to be the length of a full opinion that would be, for example, on a summary judgment --

THE COURT:  Have you clerked for a federal judge?

MR. LIGHT:  No, Your Honor.

THE COURT:  So you don't know what it's like to draft an opinion?

MR. LIGHT:  No, Your Honor.

THE COURT:  It's not that simple.  You also aren't familiar with what March 30th is, are you?  Do you know by any chance, Mr. Light, what the significance of the date March 30th is in every district judge's chambers in the United States?

MR. LIGHT:  No, Your Honor.

THE COURT:  If you clerked for a district judge, you would.  That's the date the Chief Judge of the district has to report to Congress on all motions on the judge's docket that are six months or older.  So the judge between now and March 30th has to clear out those dockets, those cases on their docket that have been there six months or longer, which, by the way, your case is not one of.  There is no chance you'll get a ruling from this court before April, none, none.  So, why not just have a hearing consolidating the PI into the merits some time in April and then you'll get an opinion after that on the merits?

Scott L. Wallace, RDR, CRR, Official Court Reporter
(202)354-3196 * scottlyn01@aol.com

MR. LIGHT:  Your Honor, the whole point of the expedited processing is to get it in time for --

THE COURT:  Time for what?

MR. LIGHT:  In time for it to be useful, for the public to be educated and contact their senators and for it to continue to be newsworthy.

THE COURT:  In order to do that, you have to meet the standard of a PI.

MR. LIGHT:  Correct.

THE COURT:  Do you really want to have to argue that?

MR. LIGHT:  That's why we filed the motion.  We believe we can meet the standard for a PI, but if Your Honor believes that an opinion couldn't be written in time for it to be -- when we would like it to be by, then rather than consolidating it with the summary judgment motion, perhaps the Court could simply deny it today so we could take an interlocutory appeal to the D.C. circuit right away.

THE COURT:  You think I'm going to do that to the D.C. Circuit, waste their time, too?

MR. LIGHT:  Well, Your Honor, if there's no way that we can get the relief that we are seeking, I don't see why the Court couldn't simply deny the order today.

THE COURT:  Denials have to be in writing.

MR. LIGHT:  Yes.

THE COURT:  I have to write an opinion.  I don't have time

to write an opinion right now, sir.  Are you not computing what I'm saying to you?

MR. LIGHT:  Your Honor, I understand that you're telling me that we cannot -- there is no possible way that we can get the relief we seek.  We would consider that --

THE COURT:  I didn't say that.  I said there's no way you're going to get an opinion --

MR. LIGHT:  Right.

THE COURT:  -- in the near future.  There isn't time.

MR. LIGHT:  Right.  The relief that we seek is to have this material processed in time for the -- before the vote occurs.  If that's not a possibility, we would consider this to be --

THE COURT:  Give me your best two minutes on irreparable harm, since you obviously have put yourself in a mindset that is what I would characterize as stubbornly intransigent.  What exactly is your best two-minute argument on how it is you think there's irreparable harm in this case?  I'll give the government two minutes to give me their rebuttal, and then we'll be done for today.

MR. LIGHT:  Well, the FOIA contemplates not just the release of information, but the release of timely information, and in order for information to be newsworthy, it can't be stale. So that's from the perspective of simply informing the public. In this case there's more than that, though, because there is an

impending vote on a nominee.  The public needs to be informed of how this nominee has performed her duties --

THE COURT:  Why?

MR. LIGHT:  In order that the public can be informed, contact their members of Congress, and for the senate to be informed to make their vote.

THE COURT:  Isn't that, to say the least, speculative that whatever information you might uncover would have any possible value in the senate confirmation process of a candidate?

MR. LIGHT:  Well, in every FOIA case, until the information's released, it's speculative.  I think that there is -- here what's significant is we have established that there is -- has been questions about the integrity of the government in agreeing to the deferred prosecution agreement with HSBC.

THE COURT:  Integrity of the government?

MR. LIGHT:  That's correct, Your Honor.

THE COURT:  Excuse me?  What's your basis to question the integrity of the government entering into the HSBC case?  Are you familiar with Judge Gleeson from the Eastern District of New York?

MR. LIGHT:  Not personally, Your Honor.

THE COURT:  Did you read his opinion where he blessed the HSBC case -- the deferred prosecution agreement?

MR. LIGHT:  Yes.

THE COURT:  You read his opinion?

MR. LIGHT:  He --

THE COURT:  It's a pretty lengthy one, isn't it?

MR. LIGHT:  Yes, Your Honor.

THE COURT:  And he gave it a look over, to say the least, that very few district judges before him had ever done.  In fact, he claimed that he had a power that a lot of federal judges never claimed that they had, a supervisory power over that deal.  He concluded that he had it, which, by the way, I agree with.

MR. LIGHT:  I read your opinion.

THE COURT:  You read *Fokker?*  Good.  So you know that Judge Gleeson and I agree on that issue.

MR. LIGHT:  Yes.

THE COURT:  But that's not exactly a widely held opinion by a lot of judges, and it's a matter of some, you know, open question in the Supreme Court and in the circuit courts, certain circuit courts.  So Judge Gleeson who, I might add, is an extremely highly regarded and seasoned trial judge and former prosecutor, looked that thing backwards, forwards, up and down and found no problem with it and blessed it, and you're telling me you think there's reason to believe that there was a question of the integrity of the Attorney General nominee when she was U.S. Attorney entering into that agreement?

MR. LIGHT:  Yes, Your Honor, that's right.  There's been widespread criticism by experts in the financial field and by the public about the integrity of the government in entering into

this, notwithstanding what a district judge may have said.

THE COURT:  Criticism of her integrity?

MR. LIGHT:  Yes.

THE COURT:  How so?  Explain that.

MR. LIGHT:  That she entered into an agreement that there would be -- a deferred prosecution agreement solely against the corporation, not against any of the individuals.  The deferred prosecution agreement, there's some question as to whether they actually complied with it.  The independent monitor had reported some issues, but the --

THE COURT:  But you know the difference surely between -- the difference of criticizing someone for their judgment --

MR. LIGHT:  -- yes --

THE COURT:  -- and criticizing their integrity.  Those are questions being raised about her judgment as a prosecutor, but not her integrity.

MR. LIGHT:  Well --

THE COURT:  Integrity goes to things like honesty.

MR. LIGHT:  Yes, Your Honor.

THE COURT:  Honesty.  Is there any basis to question the honesty of Attorney General Nominee Lynch as to entering into that deal?  What would it be?  Tell me what it would be.

MR. LIGHT:  Well, Your Honor, it may be --

THE COURT:  You haven't seen it.

MR. LIGHT:  It may be more than honesty, it may be

improper influence, for example, as in the *Fokker* opinion.  You wrote, you suggested, despite implication, that what influence could *Fokker* have asserted over the attorney -- the U.S. Attorney's Office to have secured this.

THE COURT:  I never said that.  I never said that.  That's not in my opinion.  You need to reread it.  What question has been raised in the public's mind about improper influence on Loretta lynch as U.S. Attorney in the Eastern District of New York?  Tell me.  Point it to me.

MR. LIGHT:  Your Honor --

THE COURT:  Show me.

MR. LIGHT:  If I may, I have an article from the *Financial Times* in which Senator --

THE COURT:  What's the date?

MR. LIGHT:  -- senator Blumenthal.

THE COURT:  Right.

MR. LIGHT:  This is an article from, I believe it was yesterday.  We also cited --

THE COURT:  You filed these pleadings a while ago.

MR. LIGHT:  We did.  We cited a *Wall Street Journal* article and a number of other articles in our pleadings.

THE COURT:  That raise questions about improper influence on her?

MR. LIGHT:  Your Honor, I can quote for you.

THE COURT:  Questioning her judgment is one thing as a

prosecutor, but questioning her integrity is a completely different thing.

MR. LIGHT:  Your Honor, for example, the *New York Times* editorial board said, "It is a dark day for the rule of law. Federal and state authorities have chosen not to indict HSBC on charges of vast and prolonged money laundering for fear that criminal prosecution would topple the bank and in the process endanger the financial system."  They have -- there's another quote that --

THE COURT:  Wait a minute.  Hold on.  Stop there.  Where does that even suggest improper influence?

MR. LIGHT:  It suggests that there's no compliance with the rule of law, which is improper.  It raises a question, a possible question of government integrity.  I don't know how else one would characterize disregard for the rule of law.

THE COURT:  Putting aside the fact that it's an editorial quote in a newspaper which has no relevance for this purpose, but it doesn't even raise a question about her integrity.

MR. LIGHT:  Well, Your Honor, the questions about the integrity of the government, possible questions of the integrity of the government, that's the standard --

THE COURT:  She was the decision-maker for the government. She's the United States attorney for the Eastern District of New York.  She was the decision-maker for the government.  There's no basis to believe that anyone other than her made the final call

in the HSBC case.  I have no basis to think anyone else did.  Indeed, it would be -- it would be out of routine practice for someone other than the U.S. Attorney to make that call.  You got something else that raises questions as to her integrity?

MR. LIGHT:  Your Honor, I don't have any other quotations handy.  I would just refer the Court to the cited articles in the footnotes from the pleadings -- from the motion for preliminary injunction and for the plaintiff.

THE COURT:  Go ahead.

MR. LIGHT:  Well, Your Honor, we believe that this has raised a possible question in the public's mind about the integrity of the government.  If I may quote from your *Fokker* ruling from yesterday.

THE COURT:  The problem with quoting my *Fokker* ruling is it has no application to this situation whatsoever.  Judge Gleeson, a district judge who I think highly of, carefully analyzed the HSBC situation and their whole deferred prosecution agreement and blessed it as being appropriate.

MR. LIGHT:  Well, simply because a district judge believed it doesn't mean that the public doesn't have a question as to the propriety of the agreement.  It just means that that was the opinion of the judge.

THE COURT:  Well, that happens to be an opinion that I would place a lot of trust in.

MR. LIGHT:  Well, the question isn't whether the decision

was right or wrong, but whether the public has a possible basis for believing that the public integrity of the government was compromised by the agreement.  What you're -- the reason I'm quoting -- I want to quote from the *Fokker* ruling, even though it's a different case, but it's to suggest that when a government -- even though they have some discretion as to who to prosecute -- entering into a DPA that is overly lenient, is contrary to the rule of law.

THE COURT:  But obviously Judge Gleeson did not conclude the HSBC case was overly lenient because he blessed it.

MR. LIGHT:  Well, that was his opinion.

THE COURT:  Yeah, but he was in the best position to give an opinion because he had studied it and heard the arguments and reviewed the pleadings and reviewed the deal, which I've never done.

MR. LIGHT:  But Your Honor, I'm not asking you to pass on whether the agreement was right or wrong, I'm asking you to rule on whether the public has questioned the integrity of the government based on that agreement, not whether there was anything illegal about the agreement.

THE COURT:  You want extraordinary relief.  You want a PI?

MR. LIGHT:  Yes.

THE COURT:  You have to show irreparable harm.

MR. LIGHT:  Yes.

THE COURT:  And you have to show likely success on the

merits.

MR. LIGHT:  Yes.

THE COURT:  I'm not hearing anything that shows irreparable harm, and I certainly haven't heard anything that sounds like success on the merits, so I've given you ten minutes.

MR. LIGHT:  Well, I don't have anything else to add as far as that.  I do have --

THE COURT:  Well, I got your pleadings then.  I'll look at those again.

MR. LIGHT:  If it's possible, there is one other -- would it be possible for me to enter into the record the documents that I referred to today, the *Financial Times* article about setting a date -- about when the nomination hearing might occur, and also the --

THE COURT:  You've already referenced it.  It's part of the transcript.

MR. LIGHT:  I also wanted to mention that there was a reference during the senate confirmation hearings to the HSBC matter, and I just wanted to make sure that's in the record as well.

THE COURT:  Was it a senator that raised concerns about what happened in the HSBC from the point of view that he didn't or she didn't know enough about what happened to be able to support or oppose the nomination of Ms. Lynch?  Did he or she say something like that?

MR. LIGHT:  Let me pick out the quote so I can make sure I get it accurate.  It was Senator Blumenthal, and the news report says:  He cited a deal that Ms. Lynch's office struck with HSBC in December 2012 when the bank agreed to pay $1.9 billion to settle allegations that it laundered money from Latin American drug cartels.  He asked whether she would hold corporate officers responsible for alleged wrongdoing, and she responded, quote, no individual is too big to jail, said Ms. Lynch, who was surrounded by dozens of family members, quote, nobody is above the law.

So there was -- there was a question he wanted to seek an assurance from Ms. Lynch because he had, apparently, an issue with how the HSBC deal was done and the concept of "too big to jail," and I think having some additional information about how the -- how the DPA came to -- came about, how it came to be, would be meaningful to the senate in voting on her nomination.

THE COURT:  Did the senate express any concern or frustration about not having enough information about the HSBC case?  It didn't sound like it.  It didn't sound like Senator Blumenthal, who is the only senator, apparently, raising the issue of the HSBC case even expressed any concern or frustration about what happened.

MR. LIGHT:  Well, he might not know what he doesn't know.  That is, the information that --

THE COURT:  That's usually the first sign of wisdom.

MR. LIGHT:  Well, Your Honor, it may be that he doesn't

know that there's specific documents that he hasn't been presented with, and we don't have a good accounting yet of everything that is in the government's possession.

I would note that there was -- there was one document that the government produced that would be responsive to our FOIA request but was not produced to us; it was produced -- the *Associated Press* obtained a copy of it. I believe it was produced to the senate. It's a legal and administrative management evaluation for the Eastern District of New York, which is, just to briefly summarize, it's a performance evaluation of Lynch and her office. One of the things that it refers to in there is the problems with the office in handling FOIA requests, specifically Assessment 98, "The USAO does not timely respond to requests for records." I would suggest that since there seems to be a significant problem with the office in handling FOIA requests in a timely manner, that without the relief we seek of expedited processing and an order from the Court, if things run their normal course, we will not receive the information in a timely manner.

THE COURT: Thank you.

MR. LIGHT: Did Your Honor have any other questions?

THE COURT: No.

MR. LIGHT: Okay. Thank you, Your Honor.

THE COURT: Thank you.

MS. FEDERIGHI: Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. FEDERIGHI:  Just a couple of things on irreparable harm.  Mr. Leopold has not asserted any irreparable harm to himself.  Even assuming that the harm to the public interest that he's relying on could be the basis for a preliminary injunction, he's not established irreparable harm to the public.

THE COURT:  Wouldn't it, at best, be characterizable as speculative?

MS. FEDERIGHI:  I agree with that.  As Your Honor has pointed out, there's quite a lot of information in the public domain about the HSBC case, and that's sufficient to inform debate about whether the decision was a wise decision or, you know, could have been done differently.

THE COURT:  Isn't it really an issue in the final analysis of questioning the judgment exercised to enter into the deal as opposed to the integrity of the decision makers, in particular, Ms. Lynch, for entering into a deal?

MS. FEDERIGHI:  Yes, I agree, Your Honor.  It's a question of, was the prosecutorial discretion wisely exercised?  In this case, could they have done it better?  Insofar as they want to look into whether this case was handled differently than other cases because of the nature of the defendant, that can be done on the basis of public documents.

THE COURT:  One could construct a hypothetical, obviously, where somebody saw Ms. Lynch days before the HSBC deal was inked

having dinner with the head of corporate affairs for HSBC in a fancy restaurant in Manhattan and, you know, there's some question about the integrity with which she entered --

MS. FEDERIGHI:  Yeah.

THE COURT:  But there's nothing, nothing even remotely akin to that.  There's nothing, nothing.

MS. FEDERIGHI:  It has more to do with, did they balance the effect on the economy versus the nature of the case and the evidence.  It has -- no one has ever suggested there was ever any improper influence by the defendant, for example, on the prosecution in this case.

I just want to point out that Mr. Leopold has also not established that he would be likely to get any information, any useful information at the end of the processing process, as it were.  Most of this information we've already begun to preliminarily identify responsive documents and look through them, and it appears that most of them are going to be covered by the 7A exemption for ongoing law enforcement proceedings.  This is not a closed case.  There is an ongoing monitoring of the bank.  The deferred prosecution agreement is just that.  It's deferred for five years to enable the bank to clean up its act and make sure they're on the straight and narrow.  So there is still ongoing aspects to the case.  A lot of the stuff is going to be exempt under that exemption.  A lot of what I think plaintiff appears to be looking for has to do with how did the

prosecutors reach their decisions, and that's also going to be exempt, probably, as attorney work product or deliberative process material under exemption 5.  So most of -- the things that he seems to be seeking are probably going to be exempt.  Most of the documents that he's requested are probably going to be exempt.  Very little is going to come out at the end of this process and that little, as I said, isn't necessary to inform the kind of inquiry he wants to carry on right now, which is whether it was a good decision, the best decision for the United States in the circumstances.

THE COURT:  Do you have any sense from your talking to folks over at Justice who deal with FOIA issues or whatever, how many times, if ever, a federal court has granted a PI for a FOIA request?  I've been on this court 13 years and I've never heard it, never.

MS. FEDERIGHI:  I won't deny that it's happened, Your Honor.  I did cite a number of cases in a footnote in my brief where PIs were denied, but there's probably an equal number where they have been granted or there's certainly some where it has been granted.

THE COURT:  Over the last ten years?

MS. FEDERIGHI:  Yes, unfortunately yes, but they do have to make a rare showing.  For example, one case where it might come up is if someone is facing a death penalty trial and they need the documents for that.  This is not that kind of urgent

case.  There's been other situations.  He relies on the Epic one case where a PI was granted.  But as I pointed out in my brief, later on down the road that was modified to give the government considerable more time to respond.

THE COURT:  Which one of my colleagues granted that?

MS. FEDERIGHI:  It was Judge Kennedy.

THE COURT:  He's retired now.

MS. FEDERIGHI:  It does happen, but we don't think he made the showing in this case.  In any event, there's very little that he may be entitled to in the end.  It's going to end -- his request is so broad, so enormous, that it's going to take months.  Even if this were processed on an expedited track, it's going to take months to complete responding to the request.

All the agency would be required to do, even for an expedited request, is to do it as soon as practicable and practically speaking this request will take months to finish.

THE COURT:  And do you have any insight from whatever sources you may have available to you as to when a vote is likely on her nomination?

MS. FEDERIGHI:  No, Your Honor.  I am -- I just know it's been in the newspapers.  Your information is all I have access to.  Thank you.  So, if there's no further questions, the motion for preliminary injunction should be denied.

THE COURT:  Well, I'll take it under advisement.  I have to write an opinion.  If I were in your shoes, I wouldn't be

optimistic, but I'll think it through.  I'll reread things and cogitate and write an opinion, and if I haven't finished the opinion before she is confirmed, then I'll have a status hearing to see about consolidating the merits, because I don't see any sense in writing two opinions.  That makes no sense at all to this Court.

So I'll wait and see what happens.  It may come to pass that I finish the opinion before she is confirmed, but I might not.  I don't know.  We'll see what -- Like I said, I'm in the middle of an eleven-week trial.  I'm extremely busy.

Have a nice weekend, counsel.

(Proceedings adjourned at 2:49 p.m.)

### C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace
----------------------------        ----------------
**Scott L. Wallace, RDR, CRR**              **Date**
**Official Court Reporter**